# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| KELLY NICOLE DESMOND-NEWMAN, Derivatively on Behalf of CEMTREX, INC., | Civil Action: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| SAAGAR GOVIL, ARON GOVIL, RAJU PANJWANI, SUNNY PATEL, and METODI FILIPOV, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| CEMTREX, INC., | |
| Nominal Defendant. | |

Plaintiff Kelly Nicole Desmond-Newman ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Cemtrex, Inc. ("Cemtrex" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Cemtrex with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and additional matters of public record.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties, abuse of control, waste of corporate assets, and unjust enrichment that occurred from on or about February 11, 2016 to the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      Plaintiff brings this derivative action to: (a) recover damages against Defendants for the benefit of the Company; and (b) require the Company to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repetition of the damaging events alleged herein.  Defendants have also exposed the Company to civil liability as a result of a number of securities fraud class action lawsuits (the "Securities Class Action") pending against the Company and certain of its senior executive officers.

**JURISDICTION**

3.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.      Venue is proper in this Court because the Company maintains its executive office within this County, a substantial portion of the transactions and wrongs complained of herein occurred in New York, and Defendants have received substantial compensation within this venue by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

**PARTIES**

A.      **Plaintiff**

5.      Plaintiff is, and was, a shareholder of the Company during the wrongdoing alleged herein.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of Virginia.

**B.      Nominal Defendant**

6.      Nominal Defendant Cemtrex purportedly "offers manufacturing services of advanced electronic system assemblies, provides broad-based industrial services, and provides industrial air filtration & environmental control equipment and systems globally." From 2007 until April 2015, the Company's common stock was traded on the Over-the-Counter Bulletin Board ("OTCBB") under the ticker symbol "CTEI."  Nominal Defendant Cemtrex is a citizen of New York.

**C.      Director Defendants**

7.      ***Defendant Aron Govil***[1] ("A. Govil") is the Executive Director of the Company.  A. Govil previously held the position of Company Chairman, Chief Executive Officer, President and Treasurer from 2004 until his resignation in December 2011.  Defendant A. Govil is a citizen of New York.

8.      ***Defendant Raju Panjwani*** ("Panjwani") is a Director of the Company who purports to have over 35 years of business experience, including 20 years on Wall Street, and 20 years as an entrepreneur and business builder.  Panjwani was a Managing Director with Morgan Stanley, where he spent 18 years in several senior roles in risk management, audit, strategy and being the Chief Operating Officer and Country Head for the Firm's India office.  Since leaving Morgan Stanley in 2005, Panjwani claims to have obtained considerable experience in emerging

---

[1]      Throughout the Company's SEC filings and other public statements, A. Govil's first name is spelled both as "Arun" and "Aron."

Asian markets, in negotiating complex joint ventures, mergers & acquisitions, and capital raises, particularly within the technology sector.  Panjwani is a CPA in New York State and spent several years with Price Waterhouse and other accounting firms prior to joining Morgan Stanley. Defendant Panjwani is a citizen of New York.

9.      ***Defendant Metodi Filipov*** ("Filipov") is a Director of the Company and claims to be an entrepreneur and technology executive with over 25 years of experience creating, operating and driving growth for technology companies.  Filipov was formerly VP of Operations at Cemtrex from 2008 to 2010. After Cemtrex, Filipov served as Managing Director of Bianor, a mobile consulting company providing solutions for enterprise clients.  Defendant Filipov is a citizen of New York.

10.      ***Defendant Sunny Patel*** ("Patel") is a Director of the Company and presently serves as a manager for Three Point Capital, a specialty finance company.  Patel claims to have vast experience in loan origination and creative financing vehicles for growth companies and project financing.  Before joining Three Point in 2010, Patel was an equity derivatives trader at Group 1 Trading for several years.  Patel is an activist investor who focuses on emerging growth companies with strong fundamentals.  Patel is CFA Level 3 candidate and graduated Cum Laude from New York University's Stern School of Business.   Defendant Patel is a citizen of New York.

11.      ***Defendant Saagar Govil*** ("S. Govil") is the Chief Executive Officer ("CEO") of the Company.  S. Govil has been with Cemtrex since 2008 and has been the Company's CEO and President since December 2011.  Prior to becoming the CEO, S. Govil was Vice President of Operations, responsible for sales, marketing, production, and engineering.  S. Govil began his career as an applications engineer providing customer support on-site and designing turn-key

engineered systems for various customers and projects.  S. Govil has a B.E. in Materials Engineering from Stony Brook University, N.Y.  Defendant S. Govil is a citizen of New York.

12.     ***Defendant Renato Dela Rama*** ("Rama") is Chief Financial Officer ("CFO") of the Company.  Rama is not a Director of the Company.  Rama has been Chief Financial Officer of Cemtrex since December 2004.  Prior to that, Rama worked in various accounting, banking and financial management positions.  Upon information and belief, Defendant S. Govil is a citizen of New York.

**D.     Relevant Non-Party**

13.     ***Non-Party Ducon Technologies, Inc.*** ("Ducon") is a private company that manufactures equipment and systems for environmental control, material handling, waste incineration and power transmission.  Arun Govil is Ducon's CEO and sole owner.  Ducon is also headquartered at 19 Engineers Lane, Farmingdale, NY 11735.

<u>**CODE OF BUSINESS CONDUCT AND ETHICS**</u>

14.     As members of the Cemtrex Board, the Director defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and Code of Ethics to assure the integrity of the Company's financial and business records.

15.     The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cemtrex, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## **DUTIES OF DEFENDANTS**

16.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Cemtrex, Defendants owed Cemtrex and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage Cemtrex in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of Cemtrex and its investors.

17.     Each director of the Company owes to Cemtrex and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

18.     To discharge their duties, the officers and directors of Cemtrex were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Cemtrex were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how Cemtrex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

19.      Each of the Defendants, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors

and officers of Cemtrex, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

### SUBSTANTIVE ALLEGATIONS

20.     Each of the individual Defendants, by virtue of his high-level position with Cemtrex, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his respective tenure with the Company, as alleged herein.  As alleged below, the materially false or misleading information conveyed to the public resulted from the collective actions of the individual Defendants.  Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

21.     As executive officers and/or directors of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the Nasdaq, and governed by the federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information.  Each of the individual Defendants violated these requirements and obligations during the Relevant Period.

22.     Each of the individual Defendants, because of his position of control and authority as an executive officer and/or director of Cemtrex, had access to the adverse undisclosed information about Cemtrex's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Cemtrex officers and employees, attendance at Cemtrex management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about Cemtrex materially false or misleading.

23.     Cemtrex was originally incorporated as "Diversified American Holdings, Inc." in 1998. Thereafter, the Company changed its name to "Cemtrex Inc." on December 16, 2004. Since then, Cemtrex has purportedly grown through several acquisitions from its original focus on the provision of industrial environmental control equipment to one that now operates in several different segments with manufacturing and sales around the globe.

24.     Cemtrex's business is now operated through three distinct segments: Electronics Manufacturing Serves (EMS); Industrial Products & Services (IPS); and the Monitoring Instruments and Products group (MIP).

25.     Through its EMS segment, Cemtrex provides third-party clients with electronic manufacturing services, including product design and engineering services, printed circuit board assembly and production, cabling and wire harnessing, systems integration, testing services and turnkey assembled electronic products.

26.     Cemtrex's IPS segment sells air filtration and environmental control products to a wide variety of industrial customers worldwide, while also providing for the erection, relocation, and maintenance of this equipment.

27.     Cemtrex's MIP group manufactures and sells instruments for emissions monitoring, process analysis, and controls for industrial applications and compliance with environmental regulations.

## FALSE AND MISLEADING STATEMENTS

28.     At its core, this action represents the efforts of a father, son, and accomplice who used Cemtrex for their own private gain by manipulating the Company's common stock, to the detriment of the Company.

29.     Defendants presided over a scheme to hide the fact that throughout the Relevant Period, Cemtrex insiders were concealing myriad stock transactions from the market and their investors.  They purposely skirted their mandatory reporting responsibilities under Section 16(a) of the Exchange Act to report all transactions, including sales, involving Cemtrex securities.  They also concealed the exchange of debt instruments for additional securities which served to further entrench control over the Company in the hands of Arun Govil.

30.     Defendants' misrepresentations were exposed when, on February 22, 2017, a financial author and investor published an exposé piece identifying, *inter alia*, discrepancies in insider holdings in the Company's SEC filings.

31.     While dealing with the repercussions related to Cemtrex insiders' non-disclosure of their Company transactions, further issues came to light that cast a cloud over the Company's legitimacy: (a) for years, Cemtrex had claimed ownership over a purported Indian subsidiary that it did not actually own; and (b) the Company had made the decision to shut down its recently acquired automotive electronics manufacturing plant in Paderborn, Germany despite touting the financial outlook for that very sector and the Company's positioning to capitalize on its expected growth.

32.     Seeking to conceal this information from the market so as to avoid any signal to the market and outside investors that Company insiders were reducing their holdings or otherwise executing advantageous stock exchanges to the detriment of common stockholders, Defendants regularly misrepresented the effectiveness of the Company's disclosure controls, all in the face of their own failures to comply with SEC disclosure requirements.

33.     The purpose was simple: any disruption to the Company's stock price would negatively impact the ability of Cemtrex to execute on its much-needed acquisitions – acquisitions that were predominately financed through the Company's use of stock as currency.

34.     In fact, leveraging the Company's common stock and related-party financing provided by A. Govil and his wholly-owned company Ducon, was the only practical way that Cemtrex would be able to fund these acquisitions, as traditional routes of debt and equity financing were closed to the Company as a consequence of its suspect financial statements and its ineligibility to conduct an S-3 shelf registration, as admitted by the Company in 2016 when it withdrew its request.

35.     Cemtrex used these acquisitions and related-party debt to fatten the Company's financial statements, giving the illusion of a prospering Company while simultaneously lining the pockets of A. Govil, S. Govil, and Dela Rama through related party transactions, lucrative incentive awards, and unreported stock sales, respectively.

36.     The cover-up began to unravel in late February 2017 when two financial authors began publishing investigative articles on *Seeking Alpha*, exposing, *inter alia*, the discrepancies in the Company's reported insider holdings, failure to make the appropriate filings under Section 16(a), and misrepresentations about the performance of the Company's automotive business and about Cemtrex's ownership over an Indian subsidiary.  The publication of these articles sent the

Company's common stock downwards from a closing price of $5.12 on February 21, 2017 (on volume of 972,000 shares), to a closing price of $3.40 on February 22, 2017 on volume of more than 8.2 million shares – representing a loss of nearly 30%.

37.     The Company tried everything in its power to allay the market's concerns, issuing a press release of its own and conducting a teleconference with investors on February 23, 2017 in which defendants A. Govil and S. Govil vehemently denied the claims made in the Pearson Article (defined herein) while proffering additional false statements about insider transactions to that point.

38.     Despite Defendants' best efforts to control the spin, by early March, *nearly every Cemtrex insider*, including defendants S. Govil and Dela Rama, belatedly filed a spate of Form 3 and Form 4 statements of beneficial ownership.  This apparent corroboration of the claims made in the Disclosure Articles (defined herein) caused an additional drop in the Company's stock price to $3.35 per share on March 6, 2017 (the first trading date following defendant Dela Rama's belated filing and the day of S. Govil's filing), a nearly 9% decline over the closing price on March 3, 2017.

39.     All the while, the Company continued to try to hide the truth about its Electronic Manufacturing Segment: assets it had acquired just months earlier were failing and the Company would soon be forced to shudder a key facility that was supposedly central to the growing automotive electronics market.

## THE TRUTH EMERGES

40.      On February 22, 2017, two different financial authors published fully-researched exposés about Cemtrex on the financial website *SeekingAlpha.com*, revealing the Company's misrepresentations and corporate malfeasance.

41.    First, financial analyst and author Richard Pearson published on *Seeking Alpha* and his own website at approximately 9:45 a.m. an article titled "Cemtrex: Documents and Photos, All Signs Point to Deception and Failure" (the "Pearson Article").

42.    The Pearson Article revealed that: (a) Cemtrex was being heavily promoted by a known stock promotion firm who had previously been connected with companies that have had their securities halted or delisted by the SEC; (b) Arun Govil had paid for at least one of these stock promotion articles through an entity he controlled, Southern Steel; (c) Cemtrex insiders failed to disclose any sales in Company common stock, as required by Section 16(a); (d) Cemtrex's auditor, PBA, was claiming a Texas address that was actually the site of an abandoned strip mall, and the audit firm itself was closely associated with an individual who had previously been the subject of an SEC cease-and-desist order for issuing unqualified audit reports by virtue of his lack of PCAOB registration and appropriate licensing; and (e) the Company had engaged several investment banks and investor relations firms who have repeatedly represented other heavily promoted companies and who have otherwise been implicated in securities fraud.

43.    Also, on February 22, 2017, a second author who goes by the moniker "Unemon1" published two separate posts to his *Seeking Alpha* blog. The first, titled "Is India the new China for Stock Scams?  Cemtrex Inc. Warrants a SEC Investigation and Delisting, CETX Lied About Ownershp [sic] in its Filings," ("Unemon Article 1"), and published at 10:23 a.m., focused on discrepancies in the Company's SEC filings with respect to Cemtrex's ownership over its purportedly wholly-owned subsidiary Cemtrex India and documents that entity actually filed with the Indian regulator showing its primary stockholder as A. Govil in his individual capacity and making no mention of Cemtrex as a parent.  The second, published at 10:52 am and titled "CETX is an Over-Leveraged Companies [sic] that Acquired Poorly Performing Businesses by Ramping

up Debt.  The ROB Cemtrex GmbH Case," ("Unemon Article 2") focused on the Company's use of related-party debt to finance its various acquisitions and perceived incongruities with the financial statements filed by the ROB Group and then ROB Cemtrex GmbH with the German regulators, as compared to representations made by the Company with the SEC.

44.     Collectively, the Pearson Article, Unemon Article 1, Unemon Article 2, and Unemon Article 3 (defined herein) are referred to herein as the "Disclosure Articles."

45.     The revelations contained in the Disclosure Articles published to that point sent the Company's stock careening downwards from a closing price of $5.12 on February 21, 2017 (on volume of 972,000 shares), to a closing price of $3.40 on February 22, 2017 on volume of more than 8.2 million shares – representing a loss of nearly 30%.

46.     In the immediate aftermath of the first three Disclosure Articles' publications, the Company went on the offensive seeking to control the negative spin.  On February 22, 2017 (the same day the first three Disclosure Articles were published), Cemtrex issued a press release – "a response on behalf of its shareholders in relation to a malicious blog post containing false and misleading information published by short sellers on the Seeking Alpha website."

47.     However, therein the Company continued to perpetuate misinformation, falsely stating:

> As is easily confirmed by a review of Cemtrex's proxy filings with the SEC, Arun Govil and Saagar Govil have not sold shares of Cemtrex in several years.  In addition, CEO Saagar Govil and Cemtrex Founder Arun Govil are committed to purchasing additional shares of Cemtrex in the open market and will file the appropriate Form 4's with the SEC accordingly in the days to come.

48.     This statement was false and misleading when made as it was not true that A. Govil had not sold shares in several years.  In fact, Ducon, which is wholly-owned by A. Govil,

sold hundreds of thousands of shares just months prior after A. Govil paid almost $100,000 to a stock promotion firm in order to inflate Cemtrex's stock price.

49.     Defendants then contradicted themselves while proffering additional false statements on the February 23, 2017 conference call with investors.  A transcript of this call was filed by the Company with the SEC as an exhibit to a Form 8-K filed on March 1, 2017 and signed by S. Govil as Chairman, President, and Chief Executive Officer of Cemtrex.

50.     On this conference call, S. Govil stated:

> You can see from the proxy statements of the company that no shares were sold by Arun or me, except for the shares sold by Ducon, an entity controlled by Arun in which he filed a Form 144, and it was disclosed and sold shares for Ducon in the ordinary course of business. Ducon also bought over 300,000 units of preferred shares on the same terms as all other investors in the recent rights offering.

51.     Aside from contradicting the Company's statement from the prior day and admitting to A. Govil's sale of hundreds of thousands of shares of Cemtrex common stock which would have occurred just months prior, as purportedly evidenced by a Form 144 (which does not show actual sales, but rather only an intent to sell), S. Govil also falsely represented that Ducon had purchased over 300,000 units of preferred shares on the same terms as all other investors in the recently completed rights offering.  In actuality, Ducon came to own these preferred shares by way of the extremely generous conversion of the $3.4 million note he provided to finance the Periscope acquisition.

52.     This statement by S. Govil was materially false and misleading when made as it sought to manipulate the limited information in the market to give the appearance that A. Govil and Ducon were buying into the Company on the same terms as any outside investor.  Instead, A. Govil and Ducon were being handed dilutive Company securities on beneficial terms, but only after siphoning off cash interest payments from Cemtrex's accounts.

53.     On the same call, Defendant S. Govil also materially misrepresented the status of

the Company's German EMS segment, as related to the automotive business and the outlook of

ROB Cemtrex as a whole in the wake of the Periscope acquisition:

> Cemtrex's electronics manufacturing services division has experienced dramatic growth this past year. Cemtrex's products are used in a variety of industries, including wearable devices, automobiles, telecommunications, industrial products, appliances, home automation, industrial automation, and medical devices. Many of our customers are an industry that are expanding rapidly [sic], and we expect to benefit from that growth. Cemtrex is focused on building relationships with market leaders and customers with high-growth potential in growing markets such as automotive electronics, medical devices, and wearables.

> In 2016, in our EMS division, we produced more than 300 different products for more than 50 customers, such as Harman International, AVB, and Schneider Electric. We have strengthened and grown our market share in Germany through the acquisition of Periscope. Periscope, now operating under our ROB Cemtrex brand, is focused on EMS for major automotive producers, primarily Tier 1 suppliers as well as for […] telecommunications, industrial goods, luxury consumer products, display technology, and other OEMs.

> Periscope has more than 35 years of operating experience under prior owners, like Siemens and Flextronics. The Periscope acquisition also gives Cemtrex a strong footing in the dynamic automobile industry, which is undergoing rapid technology change, with Cemtrex poised to be a significant beneficiary of this evolution and disruption. The automotive electronics market is expected to be 350 billion by 2023, up from 185 billion in 2015, according to Global Market Insights.

> Our opportunities in this space reflect anticipated growth globally. New Venture Research predicts the EMS industry at 621 billion in 2019, up from 460 billion in 2014, as more companies rely on outsourcing electronics manufacturing. ECS Insights projects the wearable device market to reach 34 billion by 2020. IDTechEx forecasts it will reach 75 billion by 2025. Research in markets estimates that the industrial control and factory automation market will reach 20—uh, 200 billion by 2020, which represents an annual growth rate of 6 percent.

54.     Defendant S. Govil's presentation of the EMS segment, particularly the Periscope

acquisition and the "strong footing in the dynamic automobile industry" was materially false and

misleading when made because it entirely omitted the then-known issues with the segment and

difficulties with existing and new orders – consistent economic problems that would ultimately cause an announcement *just one week later* of the closing of a facility purchased months prior.

55.     On February 28, 2017, ROB Cemtrex managing director Frank Bittighofer informed the German works council and affected employees of the Company's intention to shut down the Paderborn facility housing ROB Cemtrex Automotive GmbH, acquired just months earlier in the acquisition of Periscope.

56.     Despite not being reported by American financial news media, the announcement negatively impacted the Company's stock price, sending Cemtrex's stock to a closing price of $3.54 on February 28, 2017, down more than 7% over the prior day's close of $3.82.

57.     On March 1, 2017, ROB Cemtrex sent a letter to its customers informing them of the decision to shut down the Paderborn plant.  Therein, Frank Bittighofer stated:

> The background to this decision is basically reduced sales numbers and in particular the absence of new order business, which we were expecting to get for our plant in Paderborn.  The permanent operation of our plant has become, under consideration of the achieved occupancy rate, economically impossible.
>
> Our decision to close down our plant in Paderborn, after processing all existing orders, is therefore unavoidable.  We would like to point out, that this decision was not easy to take for us. But we wanted to take it at a time, where we still see a chance to shape our business relation in accordance to our mutual interests.

58.     As would later be disclosed, the decision to close the facility was the result of month-after-month shortfalls in new orders, all despite S. Govil's concurrent representations that Cemtrex was positioned to financially benefit from the evolving EMS industry, especially in the automotive space.

59.     On March 2, 2017, German newspaper Neue Westfälische published an article at 9:20 pm local time (3:20 pm ET) reporting on Cemtrex's plan to close its Paderborn facility and lay off its 120 employees.

60.     Therein, the article quoted ROB Cemtrex managing director Frank Bittighofer, who confirmed that the Company had informed the works council and employees earlier that week, while also lamenting the economic climate that required the shutdown. Roughly translated, the article states:

> The background to the decision was a sharp decline in sales and, above all, a lack of new orders." We had to take back the plans month after month. Now a level has been reached that makes a permanent operation economically impossible," said Bittighofer.

> In Paderborn, electronic parts are mainly produced for suppliers to the automotive industry and telecommunications companies. Particularly affected by the announcement of one of the key customers to suffer even a massive slump in demand for telephone equipment and accessories. Managing Director Bittighofer: "The ongoing technology change in this sector does not allow any significant new orders to be expected. Adding to that is a heavy price pressure. "

> In the medium term, this cannot be offset by other production orders. In addition, there would be political risks for the overall economy; Therefore, other customers are cautious about new projects. Against this background, ultimately, the decision to close the Paderborn plant after processing the existing orders is inevitable.  Bittighofer: "This step is not easy for us. However, we also wanted to do this in the interests of the employees at a time when there are still design options available.  The better the numbers develop over the next few months, the more scope we have for this.  "The details are to be defined together with the works council.[2]

61.     On this news, the Company's stock price would drop nearly 10%, from a closing price of $4.05 on March 1, 2017 to $3.66 on March 2, 2017.

---

[2]     The German language article is available at http://www.nw.de/lokal/kreis_paderborn/paderborn/21708958_US-Konzern-entlaesst-alle-120-Mitarbeiter-in-Paderborn.html.

62.     Despite a vehement denial of any of the claims set forth in the Pearson Article, by early March 2017, Company insiders could no longer run from the fact that each had violated Section 16(a) by failing to timely file their Form 3s and Form 4s.

63.      On March 3, 2017, Defendant Dela Rama filed a Form 4 disclosing thirteen (13) separate transactions occurring between March 2015 and July 2016, all but one of which involved the disposal of Company stock.

64.     On March 6, 2017, S. Govil filed a Form 4 disclosing eight (8) separate transactions in Company stock, all taking place between February 2013 and February 2017.

65.     On March 6, 2017, the Company's common stock closed at $3.35 per share, a nearly 9% decline over the closing price on March 3, 2017.

66.     On March 7, 2017, Shamik Shah filed both his initial statement of beneficial ownership on Form 3 and a Form 4 evidencing the acquisition of Series 1 Preferred Stock of Cemtrex.

67.     On March 7, 2017, Patel filed his initial statement of beneficial ownership on Form 3.

68.     On March 6, 2017, Unemon1 published a new article on his *Seeking Alpha* blog at 10:16 a.m., linking to his own website and reporting on the March 2, 2017 Neue Westfälische article discussing the Paderborn facility's closure ("Unemon Article 3"). Therein, Unemon1 discussed the Paderborn plant's closure in the context of Cemtrex's Periscope acquisition and highlighted Company management's past optimistic statements about the Periscope acquisition and failure to publicly disclose the news which, to that point, had only been reported by the German media.

69.     On March 6, 2017, the Company's common stock closed at $3.35 per share, a nearly 9% decline over the closing price on March 3, 2017.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

70.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

71.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

72.     Plaintiff is a current owner of Cemtrex stock and has continuously been an owner of Cemtrex stock during all times relevant to Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

73.     Because of their advisory, executive, managerial, and directorial positions with Cemtrex, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.  The Board is obligated to become and remain informed about the Company, and the Board has full and unrestricted access to any relevant records of the Company.

74.     The Company Board is currently comprised of four (4) members.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, two (2), cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action.

75.     Defendants face a substantial likelihood of liability in this action because of the aforesaid breaches set forth above.

76.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

77.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

78.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

79.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

80.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

81.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## SUBSTANTIAL LIKELIHOOD OF LIABLITY FOR THE ENTIRE BOARD

82.     By failing to satisfy their fiduciary duties, Defendants caused irreparable reputational harm to the Company, exposing the Company to millions of dollars of liability in securities class action lawsuits. Defendants caused or allowed the Company to mislead its shareholders and the general public.

83.     Each Defendant had a duty to diligently evaluate information provided to the Board in order to ensure that reasonable systems of reporting were in place with respect to all relevant information, including but not limited to information regarding the Company's business, its performance, and the veracity of the Company's financial disclosures. It was the duty of the Defendants to properly evaluate this information and provide thorough guidance and governance to the Company.  Defendants failed in these duties. Defendants either evaluated this information and intentionally or recklessly rubber-stamped the Company's misrepresentations, or recklessly failed to ensure the disclosure of information necessary to prevent the statements from being materially false and misleading.

84.     Each Defendant faces a substantial likelihood of liability in this action because of his or her failure as a director to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing materially misleading statements. Based on the size, scope, and blatancy of the wrongdoing, the Defendants must have known, or were reckless in not knowing, that the statements disseminated were materially misleading, and/or Defendants must have omitted material information necessary to prevent the statements from being materially misleading. Accordingly, Defendants face substantial exposure to liability for their total abrogation of their duty of oversight. Because each of the Defendants faces a substantial likelihood of liability for unexculpated breaches of duty, demand is excused.

85.     Based on the Board's conduct, no Cemtrex shareholder would reasonably believe the Board would respond properly to a demand in good faith. Thus, demand is excused.

**Defendant S. Govil**

86.     Defendant S. Govil is not disinterested or independent, and therefore, is incapable of considering demand because S. Govil (as CEO) is an employee of the Company who derives substantially all of his income from his employment with Cemtrex, making him not independent. As such, S. Govil cannot independently consider any demand to sue himself for breaching his fiduciary duties to Cemtrex, because that would expose him to liability and threaten his livelihood.

87.     This lack of independence and financial benefits received by S. Govil renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

88.     In addition, S. Govil is a defendant in the securities class action entitled *Thomas Cullinan v. Centrex, Inc., et al.*, Case: Case 2:17-cv-01067 (E.D.N.Y.).  As such, Defendant S. Govil cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendants A. Govil, S. Govil, and Rama**

89.     During the Relevant Period, Defendants A. Govil, S. Govil and Rama sold their personally held Company stock while in possession of material inside information about the Company's business.  As a result of these illicit sales, these defendants received direct financial benefits not shared with the Company's shareholders, and are, therefore, directly interested in a demand.  Further, these Defendants are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith arising from their illicit insider sales.

**Defendants Patel, Panjwani, and Filipov**

90.     Defendants Patel, Panjwani, and Filipov served as members of the Audit Committee.  The purposes of the Audit Committee are to assist the Board in fulfilling its oversight responsibilities related to: (i) the integrity of the Company's financial statements; (ii) the Company's internal accounting and financial reporting controls; (iii) the Company's compliance with legal and regulatory requirements; (iv) the Company's risk assessment and risk management regarding financial reporting and legal compliance; (v) the registered public accounting firm's qualifications and independence; and (vi) the performance of the registered public accounting firm.

91.     Defendants Patel, Panjwani, and Filipov breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies discussed herein.  Thus, Patel, Panjwani, and Filipov face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against Defendants for Breach of Fiduciary Duties)

92.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

93.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

94.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

95.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to the Company, Defendants made false and/or misleading statements and/or failed to disclose the material information set forth above.

96.     Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

97.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

98.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending the securities lawsuit, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

99.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

100.     By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

101.     Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.

102.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

### THIRD CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

103.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

104.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

105.    As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages. As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

106.    As a result of the misconduct alleged herein, Defendants are liable to the Company. Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### (Against Defendants for Waste of Corporate Assets)

107.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

108.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants made false and/or misleading statements and/or failed to disclose the material information set forth above.

109.    As a result of the waste of corporate assets, Defendants are each liable to the Company.

110.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' wrongful conduct, including breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 11, 2018

GAINEY McKENNA & EGLESTON

By: */s/ Thomas J. McKenna*
    Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300

Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

## VERIFICATION

I, KELLY NICOLE DESMOND-NEWMAN, have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Cemtrex, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _10th_ day of July 2018.

KELLY NICOLE DESMOND-NEWMAN